**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 17, 2003**

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES
also known as AFSCME, doing
business as AFSCME LOCAL 23
and AFSCME LOCAL 2394,

    Plaintiffs-Appellants,

and

DETROIT CITY COUNCIL,

    Intervening
    Plaintiff-Appellant,

v                            Nos. 122053, 122091

CITY OF DETROIT AND DETROIT
HOUSING COMMISSION,

    Defendants-Appellees.
_____

BEFORE THE ENTIRE COURT

CAVANAGH, J.

    We granted leave to appeal in this case to determine

whether the 1996 amendments of the Michigan housing facilities

act, MCL 125.651 *et seq.*, sever the employment relationship between a municipality and its housing commission by operation of law. We hold that the 1996 amendments, specifically MCL 125.655(3), do sever a coemployment relationship by operation of law, thus we affirm the decision of the Court of Appeals.

## I. BACKGROUND AND PROCEDURAL HISTORY

In 1933, the city of Detroit established the Detroit Housing Commission (DHC) under the authority of the housing facilities act, 1933 PA 18 (Ex Sess), MCL 125.651 *et seq.* Section 2 of the act provided that any city or incorporated village with a population of over 500,000 was authorized "to purchase, acquire, construct, maintain, operate, improve, extend, and/or repair housing facilities and to eliminate housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare."[1] Section 3 of the act authorized any city with a population of over 500,000 to create by ordinance a commission with the power to accomplish the purposes set forth in § 2.[2] Under the 1933 version of the housing facilities act, the DHC was under the control of the city, and DHC employees were city employees.

The United States Department of Housing and Urban

---

[1]See also *In re Brewster Street Housing Site*, 291 Mich 313, 323; 289 NW 493 (1939).

[2]*Id.*

2

Development (HUD) funds, monitors, and regulates public-housing authorities, including the DHC. From 1979 through 1990, the HUD Public Housing Management Assessment Program rated the DHC a poor performer. The DHC was consistently on HUD's list of severely troubled public-housing authorities because it was failing its essential purpose because of an unreasonable number of vacant and dilapidating properties, untimely rent collections, and a general failure to meet HUD standards. In an attempt to cure these problems, the city entered a series of agreements with HUD that would permit the DHC to make substantial improvements in its performance, effectiveness, and efficiency. In July 1995, HUD and the city entered into a memorandum of agreement, followed by a partnership agreement in December 1995. One of the primary objectives of the partnership was a complete separation of the DHC from the city's governmental systems.[3]

HUD and the city entered into a revised memorandum of

---

[3]Section C1(b) of the partnership agreement stated:

> The separation plan shall deal with all aspects of the housing commission, which will have the power of governance and by-laws (written draft by March 1, 1996), including: housing commission capacity to hire, fire, transfer, [and] assign employees as well as set job descriptions, compensation levels, and performance criteria. The plan will include a timetable and date certain for complete separation from the City.

agreement (revised MOA) approved by the city council in September 1996 and executed in October 1996. The revised MOA, by its terms, expired on June 30, 1997, and also focused on a complete separation from the city's governmental systems.

In June 1996, the Legislature passed 1996 PA 338, effective June 27, 1996, which substantially amended the housing facilities act. The 1996 amendments designated housing commissions, such as the DHC, as distinct "public bodies corporate" with enumerated independent powers and authorities. See MCL 125.654(5). In addition, housing commissions such as the DHC were authorized to employ and fix the compensation of their directors, officers, and other employees and to prescribe the duties of those persons. MCL 125.655(3).

The DHC was removed from HUD's troubled list in 1997. In 1998, the mayor prepared a memorandum of understanding and related ordinances, seeking to establish the DHC as a separate entity, which the city council rejected. Thus, all DHC employees were treated as city employees from 1998 through 2001 under the city's compensation and classification plan and the city housing ordinance, which expressly subjected DHC employees to the provision of the city charter related to civil service. See Detroit Code, subsection 14-5-3(7).

On July 17, 2001, relying on the 1996 amendments of the

housing facilities act, the mayor notified the city council that the DHC would begin functioning as a "public body corporate" on September 21, 2001. The mayor asked the city council to approve a proposed intergovernmental agreement between the city and the DHC to allow current city employees who elected to be employed by the DHC to continue to participate in the city's health and retirement plans. The mayor also submitted a proposed amendment of the executive organization plan recognizing DHC as a separate "statutory agency" and a proposed ordinance to implement the minimum statutory requirements of the housing act.

The city council rejected the mayor's proposals and adopted a series of ordinances and resolutions, which effectively avowed DHC employees as city employees and prevented the separation of the DHC from the city. Specifically, on September 17, 2001, the city council adopted a resolution opposing separation of the DHC from the city and retaining all DHC employees as city employees. On September 26, 2001, the city council enacted the following ordinance:

> All housing commission employees shall be members of either the classified service or the unclassified service as is provided under Section 6-517 of the Charter of the City of Detroit, and shall be entitled to all rights of all employees of the City of Detroit, including but not limited to pensions and benefits. [Detroit Code, subsection 14-5-3(7).]

Subsequently, the city council formally rejected the

5

mayor's proposed amendments to the city housing ordinance and the executive organizational plan.  The council also overrode the mayor's vetoes of the city council's resolutions and ordinances.

The American Federation of State, County and Municipal Employees (AFSCME) filed suit on September 19, 2001, in the Wayne  Circuit Court against the city of Detroit and the DHC, seeking an injunction to maintain the status quo while it pursued an unfair-labor-practice charge against the city and the DHC with the Michigan Employment Relations Commission (MERC).  On September 20, 2001, the parties stipulated the court's entry of a temporary restraining order indicating that all AFSCME DHC employees remained city employees.  On September 21, 2001, the city council intervened as a plaintiff and sought a declaratory judgment to clarify the validity of the ordinances pertaining to the operation, procedures, and employees of the DHC.  AFSCME amended its complaint on October 18, 2001, to add a request for declaratory relief concerning whether the housing facilities act gave the city the power to divest itself of the DHC and to sever its relationship with DHC employees.  On October 19, 2001, the city council amended its complaint, seeking to extend the temporary restraining order, relative only to AFSCME employees, to all DHC employees.  The city council further sought a declaratory judgment to clarify

6

the validity of the ordinances and the resolution, which provide that all DHC employees are and will remain city employees. The council also sought a permanent injunction restraining defendants from acting in a manner inconsistent with the declaratory judgment.

The trial court issued a declaratory ruling on November 19, 2001, holding that severance of the city's employment relationship with DHC employees is permissive under the 1996 amendment of the housing facilities act and that the housing facilities act did not sever the DHC from the city by operation of law. The court also found that, as recently as April 2001, the mayor had taken affirmative action to continue to treat DHC employees as city employees by proposing the budget for the fiscal year of July 2001 through June 30, 2002, which included funds for those employees. On January 25, 2002, the court entered an order declaring that the city had appropriately exercised its authority under the housing facilities act to establish employee compensation ranges and classifications to be used by the DHC, and that all DHC employees are city employees "at least until June 30, 2002."

With respect to AFSCME's request for declaratory relief, defendants filed a motion for summary disposition on February 15, 2002, on the basis that the 1996 amendments of the housing facilities act made housing commissions separate independent

7

employers by operation of law. With respect to the city council's request for declaratory relief, defendants moved for summary disposition on the basis that certain ordinances and resolutions adopted by the city council violate state law and are preempted. AFSCME filed a cross-motion for summary disposition, essentially arguing that the court had already determined that the 1996 amendments of the housing facilities act did not sever the city's relationship by operation of law and that the city had continued to exercise the power to reserve employment through its continued inclusion of DHC employees in the city's compensation plan, the inclusion of the DHC in the city budget through June 30, 2002, and the continuation of the housing ordinance until September 2001. AFSCME also argued that any changes in the status of DHC employees can only be effectuated in accordance with the city charter.

On May 21, 2002, the trial court entered an order of declaratory judgment that certain ordinances pertaining to the employment status of DHC employees were valid and enforceable. The trial court also entered a preliminary injunction barring the city from severing its employment relationship with DHC employees until further "legislative action" by the city council. The trial court, however, invalidated two of the ordinances related to the DHC because they were preempted by

the housing facilities act.

Defendants appealed and plaintiffs cross-appealed to the Court of Appeals. A unanimous panel affirmed in part, reversed in part, and vacated in part the trial court's judgment. 252 Mich App 293; 652 NW2d 240 (2002). Specifically, the Court of Appeals reversed the trial court's ruling that the 1996 amendments of the housing facilities act did not, by operation of law, sever the city's employment relationship with DHC employees, because the plain language of MCL 125.655(3) explicitly authorized housing commissions to act as independent employers. The Court of Appeals further reversed the trial court's ruling that such a severance could be attained only with the concurrence of the city council by means of direct "legislative action." Additionally, the Court reversed the trial court and held that subsections 14-5-3(2), 14-5-3(5), 14-5-3(6), and 14-5-3(7) of the Detroit Code were invalid because they were preempted by the housing facilities act. The Court affirmed the trial judge's order declaring subsection 14-5-3(9) and § 14-5-10 invalid and subsection 14-5-7(1) valid. Finally, the Court of Appeals vacated the injunction enjoining the city from divesting itself of the DHC employees.

We granted AFSCME's and the city council's applications for leave to appeal. 467 Mich 899 (2002).

AFSCME asserted, as a preliminary matter, that the Court of Appeals lacked jurisdiction to accept this case because count I of AFSCME's first amended complaint was still outstanding.  This count requested a preliminary injunction to maintain the status quo while AFSCME litigated an unfair-labor-practice change in MERC.  The Court of Appeals stated that it has the jurisdiction to entertain appeals by parties aggrieved by a final order of the circuit court.  MCR 7.203(A)(1). "Final order" is defined in MCR 7.202(7)(a)(i) as "the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties . . . ."  "Claim" is defined in MCR 2.111(B)(1) as a "statement of facts, without repetition, on which the pleader relies in stating the cause of action, with specific allegations necessary to reasonably inform the adverse party of the nature of the claims the adverse party is called on to defend . . . ."

Count I of AFSCME's first amended complaint requested the issuance of a preliminary injunction to keep the status quo while AFSCME litigated an unfair-labor-practice charge in MERC. The circuit court issued a preliminary injunction in favor of AFSCME in both the January 2002 and May 2002 orders.  The Court of Appeals concluded that these orders disposed of AFSCME's

claim for a preliminary injunction and adjudicated the rights and liabilities of the parties concerning this cause of action. The Court stated that if the injunction was not as broad as AFSCME desired, while the issue may be relevant in regard to the circuit court's actions, it is not relevant to the jurisdiction of the Court of Appeals.

We agree with the Court of Appeals analysis on the matter of jurisdiction. The circuit court's preliminary injunctions meet the criteria of a "final order" as set forth in MCR 7.203(A)(1). Therefore, the Court of Appeals had jurisdiction to entertain the parties' appeals. We also agree with defendants' assertion that the jurisdiction issue is moot because MERC issued its final ruling, dismissing the majority of plaintiffs' claims. Therefore, the Court of Appeals had jurisdiction to entertain this appeal.

### III. STANDARD OF REVIEW

"We review de novo decisions on summary disposition motions." *CAM Constr v Lake Edgewood Condo Ass'n*, 465 Mich 549, 553; 640 NW2d 256 (2002). Likewise, we review questions of statutory interpretation de novo. *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).

### IV. DHC AS AN INDEPENDENT EMPLOYER-MCL 125.655(3)

The trial court held that the 1996 amendments of the

11

housing facilities act did not, by operation of law, sever the city's employment relationship with DHC employees and that such severance could be accomplished only with the consent of the city council by means of the council taking "legislative action" under the Detroit City Charter. The Court of Appeals reversed, holding that the plain meaning of MCL 125.655(3) evidences that the Legislature explicitly authorized housing commissions to act as independent employers, separate from their incorporating cities. 252 Mich App 307. Additionally, the Court of Appeals stated that nothing in the housing facilities act implies, much less mandates, formal acquiescence by the city council before the DHC may act as a separate and autonomous employer. *Id.* We agree with the Court of Appeals and hold that the 1996 amendments of the housing facilities act, specifically MCL 125.655(3), sever the city's employment relationship with the DHC as a matter of law, unless the mayor recommends, and the city council approves, a resolution declaring otherwise.

Because the issue is one of statutory interpretation, we must apply familiar principles of statutory interpretation that were recently restated in *Omelenchuk v City of Warren*, 466 Mich 524; 647 NW2d 493 (2002):

> The paramount rule of statutory interpretation is that we are to effect the intent of the Legislature. *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 135; 545 NW2d 642 (1996). To do so,

we begin with the statute's language. If the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning, and we enforce the statute as written. *People v Stone*, 463 Mich 558, 562; 621 NW2d 702 (2001). In reviewing the statute's language, every word should be given meaning, and we should avoid a construction that would render any part of the statute surplusage or nugatory. *Altman v Meridian Twp*, 439 Mich 623, 635; 487 NW2d 155 (1992). [*Omelenchuk* at 528, quoting *Wickens v Oakwood Healthcare System*, 465 Mich 53, 60; 631 NW2d 686 (2001).]

Additionally, we may not read into the statute what is not within the Legislature's intent as derived from the language of the statute. *Omne Financial, Inc v Shacks, Inc*, 460 Mich 305, 311; 596 NW2d 591 (1999).

At issue in this case is MCL 125.655(3). Before its amendment by 1996 PA 338, MCL 125.655(3) provided:

A president and vice-president shall be elected by the commission. The commission may appoint a director who may also serve as secretary, and other employees or officers as are necessary. The commission shall prescribe the duties of its officers and employees and, *with the approval of the appointing authority, may fix their compensation.* The commission may employ engineers, architects, and consultants, when necessary. [1978 PA 205 (emphasis added).]

Under the 1978 version of MCL 125.655(3), a housing commission could fix the compensation of its employees only with the approval of the appointing authority. Without this approval, a housing commission was a coemployer with the incorporating unit, not a separate employer. See *Grand Rapids Employees Independent Union v Grand Rapids*, 235 Mich App 398,

13

403; 597 NW2d 284 (1999).

As amended in 1996, MCL 125.655(3) provides:

> A president and vice-president and other officers designated by the commission shall be elected by the commission. *The commission may employ and fix the compensation of a director, who may also serve as secretary, and other employees as necessary.* Upon the recommendation of the appointing authority, the governing body of an incorporating unit may adopt a resolution either conditioning the establishment of any compensation of an officer or employee of a commission upon the approval of the governing body or establishing compensation ranges and classifications to be used by a commission in fixing the compensation of its officers and employees. *The commission shall prescribe the duties of its officers and employees and shall transfer to its officers and director those functions and that authority which the commission has prescribed.* The commission may employ engineers, architects, attorneys, accountants, and other professional consultants when necessary. [Emphasis added.]

The statute's language is clear and unambiguous. Housing commissions have the authority to employ and fix the compensation of their employees, as well as the express authority to determine the duties of their employees.

We believe MCL 125.655(3) presents an alternative to severance. As a matter of law, the statute provides that the housing commission may employ and fix the compensation of a director and its employees as necessary. However, *if* the appointing authority makes a recommendation, the alternative becomes viable and the governing body may then adopt one of the two resolutions as set forth in the statute. However, if

14

the appointing authority does not make a recommendation, or if the governing body does not adopt a resolution based on the recommendation in accord with the statute, then the housing commission retains the exclusive authority to fix the compensation of its director and employees. Thus, we agree with the Court of Appeals that the Legislature explicitly authorized housing commissions to act as independent employers, separate from their incorporating cities.

We reject AFSCME's argument that the Court of Appeals holding renders MCL 125.655(3) a nullity. AFSCME maintains that the Court of Appeals analysis does not take into account the current status of DHC employees, which is the product of seven years of "proposals," both before and after the 1996 amendments. However, we note that the city's actions as a coemployer with the DHC, in the absence of any valid resolution, do not negate the legal status of the DHC as an independent employer. Merely because the city has been acting as a coemployer with the DHC does not mean that MCL 125.655(3) does not sever the employment relationship as a matter of law. Additionally, as has been noted by counsel for the city and the DHC, and as is apparent in several documents including the revised MOA, the DHC was not in a position to immediately separate from the city in June 1996, when the amendments of the housing facilities act became effective.

15

AFSCME argues that while MCL 125.654(5) provides that a housing commission shall be a "public body corporate," subsections a through e recite public body corporate attributes and make no reference to employment capabilities. Therefore, AFSCME would have us conclude that the designation of a housing commission as a "public body corporate" divests it of employment authority. We believe, however, that whether the attributes of a "public body corporate" specifically include employment is irrelevant because MCL 125.655(3) expressly designates employment authority to housing commissions.

AFSCME makes the same argument in relation to MCL 125.657, which sets forth the enumerated powers and duties of housing commissions. We reject this argument for the same reason. MCL 125.655(3) clearly designates employment authority to housing commissions, thus, it is irrelevant that MCL 125.657 does not set forth employment authority as an enumerated power or duty.

AFSCME also argues that MCL 125.655(3) "expressly" reserves employment classification and compensation powers to the city. This is incorrect. Contrary to AFSCME's argument, MCL 125.655(3) automatically gives housing commissions unfettered authority *unless* the appointing authority engages the alternative in the statute, as discussed above, by making

16

a recommendation to the governing body.

We also agree with the Court of Appeals that the trial court erred in holding that concurrence or "legislative action" by the city council is required before the DHC may act as a separate and autonomous employer. In fact, quite the opposite is true. Contrary to the trial court's holding, it is apparent that MCL 125.655(3) declares a housing commission an independent employer as a matter of law. Only upon the recommendation of the appointing authority and the adoption of a resolution by the governing body establishing compensation of DHC employees could the city be regarded as a coemployer.

## A. ACTIONS BY THE MAYOR

The mayor submitted four different proposals to the city council that the various parties argue satisfy the "recommendation" requirement prescribed by MCL 125.655(3): (1) the mayor's proposed resolution dated February 27, 1996, (2) the revised MOA dated October 1996, (3) the mayor's proposed amendment dated July 17, 2001, and (4) the budgets submitted by the mayor from 1997-2001. For the reasons that follow, we do not believe that any of these actions by the mayor constitute the type of recommendation required by the statute.

### 1. FEBRUARY 27, 1996, PROPOSED RESOLUTION

AFSCME and the city council argue that the February 27, 1996, resolution proposed by the mayor constituted the

17

"recommendation" required in MCL 125.655(3) before the city council could adopt a resolution. However, the 1996 amendments of the housing facilities act did not become effective until June 27, 1996. See MCL 125.655. Therefore, a resolution proposed before the effective date cannot satisfy the requirement under the statute.

## 2. THE OCTOBER 1996 REVISED MOA

The revised MOA was entered into between HUD and the city of Detroit. It was approved by the city council in September 1996 and executed in October 1996. Relevant to employment, the MOA at page five stated:

> The revised MOA also provides for steps to be taken to create a separation of systems for public housing. The City of Detroit has acknowledged its support for the transfer of certain operational functions to the DHC. . . . *The reasons for the transition are due to the DHC not being able to manage all of the critical components of its public housing program while having to depend on city operated systems (e.g.[,] in the areas of personnel,* financial management, automated data processing and procurement) . . . . The DHC is troubled and needs to not only have the capacity to operate all public housing activities in-house but it can also not afford to pay other departments for services for public housing in the long term.
>
> *It is important to note that the DHC can not immediately separate from the city with respect to all of the functions relating to* financial management, procurement and *personnel.* The agency does not have its own systems in place but will take steps under this MOA to create its own administrative systems and then move toward operating these systems separate from the City of Detroit.

DHC will follow the model used by other Housing Commissions in the State of Michigan. Transferring responsibilities to the Commission will meet HUD's concerns that the public housing program operate with significant independence and authority. The Commission will have control over necessary functions for public housing and be a part of the plans and programs for revitalization of the City of Detroit. This MOA also requires the DHC to seek additional approvals from City Council in order to take full advantage of state legislation providing greater authority for housing commissions. [Emphasis added.]

Assuming that this MOA meets the recommendation and adoption requirements under the statute, it does not contain the necessary information regarding compensation or classification of employees. MCL 125.655(3) is precise: if the appointing authority makes a recommendation, the governing body may adopt a resolution "either conditioning the establishment of any compensation . . . upon the approval of the governing body or establishing compensation ranges and classifications . . . ." Therefore, the 1996 MOA cannot serve as a recommendation sufficient to constitute a joint employer relationship between the city and the DHC.

In fact, to the contrary, the MOA notes that one of the reasons for the transition is the DHC's inability to manage all the critical components of its public-housing program while having to depend on city-operated systems. One of these "critical components" was personnel. Additionally, the MOA recognized that these transitions could not occur overnight,

because the DHC did not yet have the resources. This does not evidence a recommendation that the city retain control over the compensation and classification of DHC employees.

### 3. JULY 17, 2001, PROPOSED AMENDMENTS

The purpose of the mayor's July 17, 2001, proposed amendments of the city code was to recognize the status conferred on the DHC by the housing facilities act as a separate "public body corporate." The proposed amendments tracked the language in MCL 125.655(3) that "the commission . . . may [employ] and fix the compensation of a director . . . and . . . other employees . . . ."

While the mayor's July 17, 2001, proposed amendment may constitute a "recommendation" to the city council, the recommendation was not to "establish[] compensation ranges and classifications to be used by a commission in fixing the compensation of its officers and employees" as required by the statute. MCL 125.655(3). Instead, the recommendation merely attempted to comply with the housing facilities act by providing the DHC with authority to fix compensation for and describe duties of its employees. Therefore, the July 17, 2001, proposed amendments do not meet the statutory requirements.

### 4. BUDGETS

The trial court agreed with AFSCME and the city council

20

that the mayor's actions in submitting budgets that included funding for employees assigned to the DHC constituted the mayor's "recommendation" to the city council to fix the compensation and classification of DHC employees. The Court of Appeals rejected this position, as do we. The mayor proposed a lump sum budget for the entire city for July 2001 through June 30, 2002. This does not constitute the detailed "classification" or "compensation" recommendation required by MCL 125.655(3).

We recognize that the budgets incorporated by reference the city of Detroit *White Book*, which contains specific compensation ranges and classifications for all employment positions in the city of Detroit. The *White Book* includes positions that are unique to the DHC. The attorney for the city council informed us at oral argument that, where a separate public agency is established, such as the library, positions unique to that agency are no longer included in the *White Book*. The crux of AFSCME and the city council's argument is that the budgets constitute the recommendation of the mayor required for engaging the MCL 125.655(3) alternatives because the budgets reference the *White Book*, which includes compensation ranges and classifications for employees of the DHC; thus, the mayor recommended that the city council adopt a resolution regarding DHC compensation and classification.

We disagree and hold that the budgets did not constitute the necessary recommendation to the city council. The budgets for the city of Detroit include the recommended allocation for every imaginable service the city provides. We decline to accept the inference that the mayor, by submitting a budget that encompassed all the operating costs for the entire city, was recommending that all DHC employees remain city employees. The budget submission is too broad in scope to allow the specific conclusion that the mayor was recommending that the city council adopt a resolution regarding DHC employees compensation and classification. Further, the mayor did make specific recommendations that the DHC *separate* from the city with respect to personnel and employment functions, which were rejected by the city council.

Therefore, the mayor's submission of the general lump sum budget for the entire city could not have constituted a recommendation from the mayor on which the city council could have taken action.

B. *GRAND RAPIDS EMPLOYEES INDEPENDENT UNION V GRAND RAPIDS*

AFSCME and the city council argue that the Court of Appeals failed to follow a previous Court of Appeals decision, *Grand Rapids, supra*. In *Grand Rapids*, the city executive proposed that the city council amend existing ordinances to transfer all employment authority from the city to the housing

22

commission.  The Grand Rapids city council agreed.  The *Grand Rapids* Court held "in the absence of a city resolution to the contrary, housing commissions are now permitted to fix the compensation of their employees."  *Grand Rapids* at 405.

AFSCME and the city council maintain that the Court of Appeals holding in this case is contrary to the decision in *Grand Rapids*.  AFSCME and the city council argue that if there is a city resolution to the contrary, which there is in this case, the housing commission is not permitted to fix the compensation of its employees.  AFSCME and the city council further maintain that the 1996 amendments permitted the city to continue to exercise employment oversight for the commission and that it did so between 1996 and 2002 when it included the DHC in its budgets.

Defendants, however, counter that the Court of Appeals decision is not in conflict with the decision in *Grand Rapids* because it also held that housing commissions are independent bodies corporate and the sole employer of commission employees.  Defendants interpret *Grand Rapids* as providing that the city council *may* adopt an ordinance defining powers of the commission as the employer if it is consistent with the housing act, but the ordinance may not withhold or deny powers granted by the statute.  We agree with this interpretation; the ordinance in *Grand Rapids* did not conflict with the

housing facilities act; Detroit's does.

We decline to accept plaintiffs' position that the *Grand Rapids* Court holding that "in the absence of a city resolution to the contrary, housing commissions are now permitted to fix the compensation of their employees," is applicable in this case. The Court of Appeals in this case is not bound by that language to conclude that because there was a resolution to the contrary in this case, the DHC could not be the sole employer. The *Grand Rapids* panel and the instant panel are consistent in their reading of the housing facilities act, but differ on the facts under consideration. The *Grand Rapids* Court was not faced with a resolution in conflict with the statute and, thus, did not have to address what happens when there is such a resolution. Therefore, the Court of Appeals did not err by declining to follow the fact-specific holding from *Grand Rapids*.

V. DETROIT CITY ORDINANCES

The Court of Appeals opined that subsections 14-5-3(5) to (7) of the Detroit City Code are in direct conflict with MCL 125.655(3). The city council argues that this is incorrect. We reject the council's arguments, however, and agree with the Court of Appeals.

The city of Detroit is a "home rule city." *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 637, 652, 669 n 8; 537

24

NW2d 436 (1995)(opinions by Weaver, Cavanagh, and Mallett, JJ.).  We have held that "home rule cities enjoy not only those powers specifically granted, but they may also exercise all powers not expressly denied." *Detroit v Walker*, 445 Mich 682, 690; 520 NW2d 135 (1994).  As a home rule city, certain powers are left to the city under Michigan's constitution:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. *Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law.*  No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section.  [Const 1963, art 7, § 22 (emphasis added).]

While prescribing broad powers, this provision specifically provides that ordinances are subject to the laws of this state, i.e., statutes.  See also the Home Rule City Act, MCL 117.1, *et seq.*, specifically MCL 117.4j(3), which provides:

> For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns subject to the constitution and general laws of this state.

This Court has held that a municipality may not enact an

25

ordinance that directly conflicts with the state statutory scheme or if the state statutory scheme preempts the municipality's ordinance by "occupying the field of regulation which the municipality seeks to enter, to the exclusion of the ordinance, even where there is no direct conflict between the two schemes of regulation." *People v Llewellyn*, 401 Mich 314, 322; 257 NW2d 902 (1977). As analyzed below, it is clear that the city ordinances at issue directly conflict with the housing facilities act.

A. Subsections 14-5-3(5) and (6)

The city council amended subsections 14-5-3(5) and (6) to provide:

> (5) The mayor *shall* recommend to the City Council either a compensation Schedule or compensation ranges and classifications for the [housing] Commission officers and employees.

> (6) The City Council *shall* adopt a resolution either conditioning the establishment of any compensation of an officer or employee of a commission upon the approval of the City Council or establishing compensation ranges and classifications by the commission in fixing the compensation of its officers and employees. [Emphasis added.]

The city council's position is that the plain meaning of MCL 125.655(3) suggests that the mayor (or "appointing authority") has an affirmative duty to make recommendations to the city council (or "governing body"). The city council maintains that the statute is discretionary because it

26

provides that "[u]pon the recommendation of the appointing authority, the governing body of an incorporating unit *may* adopt . . . ." (Emphasis added). The city council would have us interpret this as giving the governing body discretion to adopt either a requirement that the compensation of each officer or employee be approved or establish compensation ranges and classifications. The city council believes that while it may choose either of the two alternatives, it must in fact act. If the city council has the affirmative duty to choose an alternative, the city council states that it is incumbent upon the appointing authority to make the appropriate recommendations. Under the city council's interpretation, the appointing authority has discretion regarding what is recommended, not whether to make a recommendation. If the city council's interpretation is correct, it would follow that subsections 14-5-3(5) and (6) do not conflict with the statute and thus are not invalid.

The city council's position, however, is flawed. Subsections 14-5-3(5) and (6) do conflict with MCL 125.655(3) and are preempted. We cannot read into the statute what is not there. *Omne Financial* at 311. MCL 125.655(3) includes no duty to make a recommendation. Likewise, we cannot read into the statute a duty mandating the adoption of a resolution regarding employee compensation and classification.

Rather, as discussed in part IV, we believe MCL 125.655(3) presents two alternatives. As a matter of law, the housing commission may employ and fix the compensation of a director and employees as necessary. *If* the appointing authority makes a recommendation, the second option becomes viable and the governing body may adopt one of the two resolutions as set forth in the statute. However, if the appointing authority does not make a recommendation or if the governing body does not adopt a resolution in accord with the statute, the housing commission has the exclusive authority to fix the compensation of its director and employees.

Subsection 14-5-3(5) provides that the mayor *shall* make a recommendation to the city council regarding compensation and classification of DHC employees. Likewise, subsection 14-5-3(6) states that the city council *shall* adopt a resolution regarding compensation and classification of DHC employees. The city code makes the mayor's recommendation and the city council's adoption mandatory.

However, MCL 125.655(3) clearly provides, in pertinent part:

> *The commission may . . . fix the compensation of a director . . . and other employees as necessary. Upon the recommendation of the appointing authority,* the governing body of an incorporating unit *may* adopt a resolution either conditioning the establishment of any compensation of an officer or employee of a commission upon the approval of the governing body or establishing

28

> compensation ranges and classifications to be used by a commission in fixing the compensation of its officers and employees.  [Emphasis added.]

Subsections 14-5-3(5) and (6) are clearly contrary to the plain language of the statute.  First, the statute gives the housing commission the express authority to fix the compensation of its director and other employees.  Second, the statute provides that "[*u*]*pon* the recommendation of the appointing authority, the governing body . . . *may* adopt a resolution" regarding the compensation and classification of housing commission employees.  There is nothing in the language of the statute mandating that the appointing authority make a recommendation to the governing body.  Therefore, subsection 14-5-3(5) is contrary to the plain language of the statute and is invalid.  Likewise, there is nothing in the language of the statute mandating that the governing body adopt a resolution.  Therefore, subsection 15-5-3(6) is also contrary to the plain language of the statute and is also invalid.

Because the mandates in subsections 14-5-3(5) and (6) directly contradict the express language of MCL 125.655(3), which gives the appointing authority the discretion to make a recommendation and the governing body the discretion to adopt a resolution, subsections 14-5-3(5) and (6) are invalid.

## B. SUBSECTION 14-5-3(7)

The city council's amendment of subsection 14-5-3(7) provides:

> All housing commission employees shall be members of either the classified service or the unclassified service as is provided under Section 6-517 of the Charter of the City of Detroit, and shall be entitled to all rights of all employees of the City of Detroit, including but not limited to pensions and benefits.

We hold today that the 1996 amendments of the housing facilities act, specifically MCL 125.655(3), sever the city's employment relationship as a matter of law, unless the mayor recommends and the city council approves a resolution declaring otherwise. As we have already established, the mayor did not make such a recommendation; therefore, there was nothing for the city council to approve. As a result, subsection 14-5-3(7), declaring that all DHC employees are city employees, is contrary to MCL 125.655(3) and the mayor's actions in this case; thus, subsection 14.5-3(7) is invalid.

## C. OTHER ORDINANCES

To the extent AFSCME argues that if the ordinances are declared invalid, the status quo will revert to the prior housing ordinance, which still maintains DHC employees as city employees, AFSCME is mistaken. Any prior ordinances that conflict with the housing act are invalid and have no effect.

30

## VI. CONCLUSION

We hold that the 1996 amendments, specifically MCL 125.655(3), sever a coemployment relationship between a municipality and its housing commission by operation of law. The only way to establish a coemployment relationship is under the unambiguous language of MCL 125.655(3): upon the recommendation of the appointing authority, the governing body may adopt a resolution regarding the compensation and classification of housing commission employees. In this case, the mayor of the city of Detroit did not make such a recommendation, therefore, the DHC is the sole and independent employer of DHC employees. As a result, ordinances enacted by the Detroit city council to the contrary are invalid. The judgment of the Court of Appeals is affirmed.

> Michael F. Cavanagh
> Maura D. Corrigan
> Elizabeth A. Weaver
> Marilyn Kelly
> Clifford W. Taylor
> Robert P. Young, Jr.
> Stephen J. Markman